# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **BRUNO K. MPOY,**<br><br>    **Plaintiff,**<br><br>        v.<br><br>**ADRIAN FENTY,** *et al.*,<br><br>    **Defendants.** | **Civil Action No. 09-1140 (JEB)** |

## MEMORANDUM OPINION

In 2007, Plaintiff Bruno Mpoy was hired by the District of Columbia to work as a special-education teacher at Ludlow Elementary School through the DC Teaching Fellows Program. At the end of his first year of teaching, his employment was terminated in what he claims was retaliation for complaints he had lodged with then-District of Columbia Public Schools Chancellor Michelle Rhee. Mpoy's complaints to Rhee concerned challenges he had encountered as a teacher at Ludlow, as well as an allegation that the school's principal, Donald Presswood, had instructed him to falsify test results of his students.

Mpoy initially brought this suit against the District and Presswood (the "District Defendants"), Rhee, and The New Teacher Project alleging a violation of his First Amendment rights under 42 U.S.C. § 1983 and also asserting five non-federal causes of action. In an earlier decision, this Court dismissed the case against the New Teacher Project. See Mpoy v. Fenty, --- F. Supp. 2d ---, 2012 WL 2512932 (D.D.C. July 2, 2012) (Mpoy I). The remaining Defendants now separately move for judgment on the pleadings, arguing that Mpoy's First Amendment claim fails as a matter of law because his statements were made pursuant to his official duties as a public employee and thus does not constitute protected speech. They also contend that even if

1

Mpoy's speech were protected, Presswood and Rhee are entitled to qualified immunity.  The Court agrees with both arguments and thus will grant Defendants' Motions as to Count I. Having done so, the Court declines to exercise supplemental jurisdiction over Plaintiff's remaining state-law claims, which he may refile in the appropriate local court.

## I.    Background

According to Plaintiff's Second Amended Complaint, which must be presumed true for purposes of these Motions, Mpoy was recruited in 2007 to serve as a special-education teacher in the D.C. Public Schools through the DC Teaching Fellows (DCTF) program.  See Second Amended Complaint, ¶¶ 28-29.  By joining the DCTF program, Mpoy committed to teach in DCPS for a minimum of four years in exchange for receiving tuition support for working towards and receiving his teaching certification at George Washington University.  See id., ¶¶ 31-32.  Accordingly, he began attending classes at GWU's Graduate School of Education and Human Development in the summer of 2007.  See id., ¶ 37.

Mpoy started teaching special-education students at Ludlow Elementary School at the beginning of the 2007 school year.  See id., ¶ 34.  He faced a number of challenges at Ludlow, including:

- a dirty classroom, see id., ¶ 39;

- insufficient teaching materials (including books), see id., ¶ 40;

- a lack of feedback from Presswood following his formal classroom observation, see id., ¶¶ 42-45;

- "hostile, unprofessional, and unwilling," and "disruptive" teaching assistants, id., ¶¶ 46-50; and

- a failure by the administration to respond to Mpoy's concerns about classroom facilities, supplies, and the teaching assistants.

See id., ¶¶ 40, 51-62, 76-78.  Additionally, Mpoy claims that Presswood ordered him to falsify student scores and records.  See id., ¶¶ 63-75.  "Presswood instructed Plaintiff to falsify the [assessments of his special-education students] and other records of his special-education students to make it seem that his students had demonstrated acceptable progress in accordance with [D.C. and national requirements]."  Id., ¶ 70.  When Mpoy would not follow Presswood's instructions, the principal enlisted other teachers to falsify the records of Mpoy's students.  See id., ¶¶ 72-74.

Rather than working to resolve Mpoy's concerns, Presswood "harass[ed] and threaten[ed] Plaintiff and hindered his ability to teach."  Id., ¶ 79.  In January and February 2008, Mpoy received unwarranted warnings from Presswood accusing him of "excessive tardiness and failure to follow lesson plans" and "accusing him of not monitoring students, failure to escort students and failure to follow fire drill procedures."  See id., ¶¶ 80-81.  Additionally, on May 7, 2008, Mpoy was issued a five-day suspension, at Presswood's recommendation, for "insubordination" and failure "to follow instructions issued by your supervisor to conduct a classroom observation."  Id., ¶¶ 82-83.  Presswood also made allegations of corporal punishment against Mpoy.  See id., ¶ 85.

On June 2, 2008, Mpoy sent an email to Chancellor Rhee describing his concerns about classroom facilities, supplies, and the teaching assistants, as well as his distress that Presswood had ordered him to falsify student records.  See id., ¶ 86.  In the email to Rhee, Mpoy requested an investigation into these problems.  See id., ¶ 93.  Two days later, Mpoy was summoned to a meeting in Presswood's office, along with the director for DCTF and the DCPS Assistant Director for Special Education.  See id., ¶ 87.  Presswood threatened to recommend that Mpoy not be reappointed to his teaching position for the following year.  See id., ¶ 88.  Shortly

thereafter, Presswood issued Mpoy's evaluation, indicating that Mpoy was either ineffective or needed improvement in every area of evaluation.  See id., ¶ 90.  Plaintiff believed that this evaluation "was baseless, as it is contradicted by the numerous statements of Plaintiff's colleagues and parents of his students that demonstrate Plaintiff was a hardworking teacher who was effective in improving his students' abilities and was consistently trying to improve his teaching skills."  Id., ¶ 91.

On July 9, 2008, Mpoy met with a representative from the Chancellor's office and the director for DCTF.  See id., ¶¶ 94-95.  During the meeting, Mpoy was informed that Presswood had in fact recommended nonrenewal of his teaching position at Ludlow.  See id., ¶ 95.  Mpoy returned to Ludlow for the first day of school on August 19, 2008, and was informed by the school's new principal that he had been terminated.  See id., ¶¶ 98-99.  That day he received a copy of his termination letter (dated July 15, 2008), stating that "based on input from your principal and your status as a probationary employee, your position as teacher with District of Columbia Schools is terminated effective August 1, 2008."  See id., ¶¶ 100-103.  Because he was not continuing in his teaching role, Mpoy was no longer able to take courses at GWU.  See id., ¶¶ 105-06.

Mpoy filed this suit on June 22, 2009.  See ECF No. 1.  He later filed a Second Amended Complaint on June 15, 2011, setting forth six counts: deprivation of his rights under 42 U.S.C. § 1983, retaliation in violation of the D.C. Whistleblower Act, retaliation in violation of the D.C. Human Rights Act, breach of contract for wrongful termination, breach of contract for failure to pay tuition as promised, and civil conspiracy to wrongfully terminate Plaintiff.  All counts were asserted against the District Defendants and Rhee, and the last two also name The New Teacher Project (TNTP).  See ECF No. 77.

On July 2, 2012, this Court issued a Memorandum Opinion granting TNTP's Motion to Dismiss and granting in part and denying in part the District Defendants' Motion to Dismiss. See Mpoy I, 2012 WL 2512932.  The Court dismissed Count I (§ 1983) as to the District, but allowed it to proceed against Defendants Rhee and Presswood in their individual capacities.  The Court also struck Plaintiff's claim for punitive damages against the District, but allowed all other claims against the District Defendants and Rhee to proceed.  See id.  Defendant Rhee and the District Defendants have now separately filed the instant Motions for Judgment on the Pleadings under Federal Rule of Civil Procedure 12(c).

## II.    Legal Standard

This Court evaluates a Rule 12(c) motion for judgment on the pleadings under the same standard as a Rule 12(b)(6) motion to dismiss.  See Robinson-Reeder v. Am. Council on Educ., 532 F. Supp. 2d 6, 12 (D.D.C. 2008).  The factual allegations presented in the Complaint must thus be presumed true and should be liberally construed in Plaintiff's favor.  See Leatherman v. Tarrant Cnty. Narcotics Intelligence & Coordination Unit, 507 U.S. 163, 164-68 (1993).  The notice-pleading rules are "not meant to impose a great burden upon a plaintiff."  Dura Pharm., Inc. v. Broudo, 544 U.S. 336, 347 (2005).  Although "detailed factual allegations" are not necessary to withstand a Rule 12(b)(6) motion, Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007), "a complaint must contain sufficient factual matter, [if] accepted as true, to state a claim to relief that is plausible on its face."  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (internal quotation omitted).  Plaintiff must put forth "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Id.  Though a plaintiff may survive a Rule 12(b)(6) motion even if "recovery is very remote and unlikely," Twombly, 550 U.S. at 556 (quoting Scheuer v. Rhodes, 416 U.S. 232, 236 (1974)), the facts

alleged in the complaint "must be enough to raise a right to relief above the speculative level." Id. at 555.

A motion for judgment on the pleadings under Rule 12(c) must rely solely on matters within the pleadings, see Fed. R. Civ. P. 12(d), which include statements adopted by reference as well as copies of written instruments joined as exhibits.  Fed. R. Civ. P. 10(c).  Where the Court must consider "matters outside the pleadings" to reach its conclusion, a motion for judgment on the pleadings "must be treated as one for summary judgment under Rule 56."  Fed. R. Civ. P. 12(d); see also Yates v. District of Columbia, 324 F.3d 724, 725 (D.C. Cir. 2003).

## III.   Analysis

Among the myriad challenges they raise to the causes of action in Plaintiff's Second Amended Complaint, Defendants principally argue that Plaintiff receives no First Amendment protection for his email to Rhee because his statements therein were made pursuant to his official duties as a public employee and thus do not constitute protected speech.  Alternatively, they argue that even if the speech were protected, Plaintiff's claim would nonetheless be barred by qualified immunity because his constitutional right to such speech was not clearly established at the time of his email.  Without this federal hook, Defendants urge the Court to decline to exercise supplemental jurisdiction over the remaining common-law and statutory claims.

Plaintiff initially responds that the Court has already rejected the First Amendment arguments Defendants now advance, thus barring their reassertion under the law-of-the-case doctrine.  Even if the Court were to entertain Defendants' arguments, Plaintiff maintains that his speech was protected as he was speaking on a matter of public concern, and no qualified immunity exists.  Finally, Plaintiff argues that the Court need not exercise supplemental jurisdiction over the remaining claims as diversity jurisdiction is also proper here.

The Court will look at these issues separately, beginning with the law of the case, moving to an analysis of the First Amendment issues at play, and then finishing with discussions of qualified immunity and supplemental jurisdiction.

    A.    <u>Law of the Case</u>

Plaintiff first argues that the Court need not address Defendants' First Amendment arguments as they are an "inappropriate attempt to get a second bite at the apple" and are barred under the "law of the case" doctrine.  Pl.'s Opp. at 10.  Defendants counter that the Court has never ruled on these issues, and, even if it had, the "law of the case" doctrine would not apply because the decisions were not final.  <u>See</u> Rhee Reply at 2-3; District Reply at 2-5.

Under the law-of-the-case doctrine, "a court involved in later phases of a lawsuit should not re-open questions decided . . . by that court or a higher one in earlier phases." <u>Crocker v. Piedmont Aviation, Inc.</u>, 49 F.3d 735, 739 (D.C. Cir. 1995); <u>see also</u> <u>LaShawn A. v. Barry</u>, 87 F.3d 1389, 1393 (D.C. Cir. 1996) (<i>en banc</i>) (describing law-of-the-case doctrine as proposition that "the same issue presented a second time in the same case in the same court should lead to the same result").  The Court's July 2, 2012, Memorandum Opinion, however, did not reach the issues now raised, thus precluding any application of the doctrine.  <u>See</u> <u>Mpoy I</u>, 2012 WL 2512932.

In its Memorandum Opinion, the Court determined that Mpoy's § 1983 claim (Count I) could proceed against Defendants Rhee and Presswood in their individual capacities, but not against the District of Columbia or Rhee and Presswood in their official capacities.  <u>See</u> <u>id.</u> at *4. Contrary to Plaintiff's assertions, the Court's did not "<i>sub silentio</i>" rule upon the substance of this count.  <u>See</u> Pl.'s Opp. at 9.  While the District's Motion to Dismiss did include an alternate argument that Mpoy had not engaged in protected speech, <u>see</u> ECF No. 82-1 at 6-8, the Court

dismissed Count I against the District under a municipal-liability theory and never reached this separate argument.  See Mpoy I, 2012 WL 2512932 at *3-4.  Nor did the Court analyze such argument with respect to Defendants Rhee and Presswood; instead, it merely determined that Count I could proceed to the extent Plaintiff was suing them in their individual capacities.  See id. at *4.

As neither this Court – nor any appellate court – has reached the § 1983 issues raised here, the law-of-the-case doctrine does not bar the Court's evaluation of them.

B.      First Amendment Protections for Public Employees

Until 2006, Pickering v. Bd. of Educ., 391 U.S. 563 (1968), and Connick v. Myers, 461 U.S. 138 (1983), provided the framework for analyzing the scope of protections for speech made by public employees.  In Pickering, the Supreme Court held that a high school teacher's letter to a local newspaper criticizing the school's athletics budget was a matter of public concern and was thus protected speech.  See 391 U.S. at 574.  In doing so, it affirmed that public school teachers do not relinquish their First Amendment right to speak on matters of public concern simply because they are public employees.  Id. at 563.  The Court articulated a balancing test to assist in resolving public-employee free-speech issues: "[T]he problem in any case is to arrive at a balance between the interests of the teacher, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees."  Id. at 568.

In Connick, the Supreme Court built on Pickering's analysis, clarifying that a public employee's speech must pertain to matters of genuine public concern if it is to enjoy constitutional protection.  See 461 U.S. at 138.  There, the Court held that an Assistant District Attorney's circulation of a questionnaire to other attorneys in her office concerning a number of

issues, including office transfer policy, office morale, the need for a grievance committee, the level of confidence in supervisors, and whether employees felt pressured to work in political campaigns, only presented matters of public concern with respect to the issue of political pressure, and the Court ultimately concluded that the "limited First Amendment interest" did not outweigh the government's interest in effectively administering the office.  Id. at 154.

Under the Pickering-Connick framework, courts first determine whether an employee spoke as a citizen on a matter of public concern.  See Connick, 461 U.S. at 138-39.  If not, the employee has no cause of action for retaliation, and the court does not consider the second part of the test, which requires balancing the employee's interest as a citizen in commenting on public matters and the employer's responsibility to promote efficient public services.  See Pickering, 391 U.S. at 568.

The Supreme Court's 2006 decision in Garcetti v. Ceballos, 547 U.S. 410 (2006), altered this analysis, requiring a court to first consider whether the public employee's speech was pursuant to his official duties; only if it finds that the employee is speaking as a private citizen and not pursuant to his official duties will a court proceed to review the content of the speech.  Id. at 421-22.  Garcetti involved a deputy district attorney's memorandum to his supervisor expressing his view that an affidavit used to obtain a search warrant contained serious misrepresentations.  Id. at 414.  The Court explained that "[u]nderlying [the Supreme Court's employee-speech jurisprudence] has been the premise that while the First Amendment invests public employees with certain rights, it does not empower them to 'constitutionalize the employee grievance.'"  Id. at 420 (quoting Connick, 461 U.S. at 154).  Specifically, Garcetti "h[e]ld that when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their

9

communications from employer discipline." Id. at 421.  Garcetti thus imposed a threshold inquiry

into whether the public employee was speaking pursuant to official duties before engaging in the

Pickering-Connick balancing.  See Leverington v. City of Colorado Springs, 643 F.3d 719, 724

(10th Cir. 2011); Evans-Marshall v. Bd. of Educ. of Tipp City Exempted Vill. School Dist., 624

F.3d 332, 343 (6th Cir. 2010).

Plaintiff, however, argues that this threshold inquiry is not necessary here because Garcetti

is "not applicable to cases related to scholarship or teaching, including speech in a public school

setting."  See Pl.'s Opp. at 12.  Plaintiff's broad contention stems from language within Garcetti

alluding to the intersection between the public-employee speech doctrine and academic freedom.

In a dissenting opinion, Justice Souter  – joined by Justices Stevens and Ginsburg – raised

concerns about the impact of the majority's opinion on academic freedom, where the

> ostensible domain beyond the pale of the First Amendment is
> spacious enough to include even the teaching of a public university
> professor, and I have to hope that today's majority does not mean to
> imperil First Amendment protection of academic freedom in public
> colleges and universities, whose teachers necessarily speak and
> write "pursuant to . . .  official duties."

547 U.S. at 438-39 (Souter, J., dissenting).  The majority acknowledged these concerns;

however, it ultimately declined to address them under the facts of the case:

> Justice Souter suggests today's decision may have important
> ramifications for academic freedom, at least as a constitutional
> value.  There is some argument that expression related to academic
> scholarship or classroom instruction implicates additional
> constitutional interests that are not fully accounted for by this
> Court's customary employee-speech jurisprudence.  We need not,
> and for that reason do not, decide whether the analysis we conduct
> today would apply in the same manner to a case involving speech
> related to scholarship or teaching.

Id. at 425.

Neither the Supreme Court nor this Circuit has issued a subsequent opinion providing guidance on the applicability of <u>Garcetti</u> to a case involving speech related to scholarship or teaching.  Indeed, the continued lack of clarity on the issue was recognized by this Circuit in <u>Emergency Coal. to Defend Educ. Travel v. U.S. Dept. of the Treasury</u>, 545 F.3d 4 (D.C. Cir. 2008).  In a concurrence, Judge Edwards declined to delve into the contours of the academic-freedom concept, acknowledging:

> The Court in <u>Garcetti</u> neither refutes the existence of academic freedom as a part of the First Amendment, nor rejects the suggestion that academic freedom may extend beyond the Court's "customary employee-speech jurisprudence."  Rather, the Court simply leaves undecided the many questions relating to the concept and breadth of academic freedom.  Prudence commands that we do the same, for the dispute in this case does not raise any serious questions about the contours of academic freedom.

<u>Id.</u> at 18 (Edwards, J., concurring).

Similarly, this Court need not decide the scope of any academic-freedom exception to <u>Garcetti</u>, as the speech at issue here does not involve scholarship, curricula, or pedagogy.  On the contrary, Plaintiff's email to Rhee – the speech he claims is protected here – related to classroom facilities, supplies, teaching assistants, and test scores.  None of this pertains to academic freedom or the expression of particular ideas.  Plaintiff nonetheless attempts to extend the "academic freedom" doctrine to anything related to school, teachers, or education.  <u>See</u> Pl.'s Opp. at 12-13 (contending that <u>Garcetti</u> should not apply "when deciding cases involving speech by public school teachers" or to cases "in an academic setting").  Such a reading, however, is unprecedented in its breadth.

First, there is substantial doubt that the <u>Garcetti</u> exception would even apply to elementary-school teachers.  The Sixth Circuit noted as much in <u>Evans-Marshall</u>, where it

rejected a high school teacher's argument that "academic freedom" should apply to in-class curricular speech:

> As a cultural and a legal principle, academic freedom "was conceived and implemented in the university" out of concern for "teachers who are also researchers or scholars-work not generally expected of elementary and secondary school teachers." J. Peter Byrne, <u>Academic Freedom: A "Special Concern of the First Amendment"</u>, 99 Yale L.J. 251, 288 n. 137 (1989). "[U]niversities occupy a special niche in our constitutional tradition" and the constitutional rules applicable in higher education do not necessarily apply in primary and secondary schools, where students generally do not choose whether or where they will attend school. <u>Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1</u>, 551 U.S. 701, 724-25 (2007).

624 F.3d at 343-44.

Second, even if the exception applied outside the university context, it surely would not apply in a case involving speech that does not relate to either scholarship or material taught. A close parallel is found in <u>Kelly v. Huntington Union Free School Dist.</u>, 2012 WL 1077677 (E.D.N.Y. March 30, 2012), where an elementary school teacher claimed her First Amendment rights were violated when her employer retaliated against her for complaints regarding "(1) [her supervisor's] alleged improper support of a specific Board candidate by giving out parents' addresses, (2) [her supervisor's] alleged improper tutoring of a student in violation of school policy, and (3) allegedly unsafe boating conditions on a school trip." <u>Id.</u> at *12. The court's inquiry focused on the substance of the speech and determined that the academic-freedom concerns of <u>Garcetti</u> were not implicated where

> [t]he speech at issue here, in an elementary school, related not to academic freedom or the substance of classroom instruction, but rather issues of safety, teacher staffing, misuse of school information, and violation of school policy. Thus, any potential exception to <u>Garcetti</u> for cases centered on academic freedom has no applicability here.

<u>Id.</u> at *15 n.18.

12

Just as in <u>Kelly</u>, Plaintiff's complaints here had nothing to do with academic freedom. <u>Cf.</u> <u>Adams v. Trustees of the Univ. of N.C.-Wilmington</u>, 640 F.3d 550 (4th Cir. 2011) (academic-freedom exception applied to public-university professor's academic scholarship pubished in columns, books, and commentaries).  With no authority supporting Plaintiff's expansive reading of the academic-freedom doctrine, this Court declines his invitation to extend the doctrine to cover speech that involves neither curricula nor scholarship, merely because it was made by a teacher.  The Court, accordingly, will review Mpoy's speech pursuant to the normal framework set forth in <u>Garcetti</u>.

C.      Public Employee vs. Private Citizen

Having found that <u>Garcetti</u> applies, the Court must next determine whether – as a matter of law – the statements at issue were made by Mpoy pursuant to his official duties or as a private citizen.  Courts have recognized that the inquiry into whether speech was made pursuant to an employee's "official duties is 'a practical one,'" focused on whether the speech "was part-and-parcel of [the employee's] concerns about his ability to properly execute his duties."  <u>Weintraub v. Bd. of Educ. of City Sch. Dist. of the City of New York</u>, 593 F.3d 196, 202 (2d Cir. 2010) (citations and internal quotation marks omitted).  "The inquiry into whether a public employee is speaking pursuant to her official duties is not susceptible to a brightline rule."  <u>Ross v. Breslin</u>, 693 F.3d 300, 306 (2d Cir. 2012).  Courts must examine the nature of the plaintiff's job responsibilities, the nature of the speech, and the relationship between the two.  <u>See</u> <u>Weintraub</u>, 593 F.3d at 201-02.  Context, such as whether the complaint was also conveyed to the public, may properly influence a court's decision. <u>See</u> <u>id.</u> at 205.

In <u>Adams v. New York State Educ. Dep't</u>, 752 F. Supp. 2d 420 (S.D.N.Y. 2010), a court in the Southern District of New York rejected claims by teachers that the complaints they had

filed with school authorities alleging a principal's falsification of attendance and grade records

was not related to their responsibilities as public school teachers.  Id. at 429.  The court

determined that this speech was within the scope of their professional duties as teachers:

> Only in an odd Wonderland world could a court of law find it
> plausible that a public school principal's explicit order to a teacher
> directing her to falsify her own students' grades "has no bearing"
> on the teacher's official responsibilities as a teacher . . . .  Under
> Iqbal's "common sense" counsel, as well as under Garcetti's
> "practical" test, that proposition cannot hold.  Plaintiffs cannot
> plausibly establish that their complaining about a principal's
> falsification of student grades or attendance records is not "part-
> and-parcel" of their concerns as school teachers.

Id. at 430.

The complaints raised by Mpoy are similarly "part-and-parcel" of his concerns as a

school teacher.  In the June 2, 2008, "Request for Investigation" email sent to Rhee, Mpoy

frames his concerns as those of an employee of the District: "I am a special education teacher at

Ludlow Taylor ES.  As a teacher, my primary duty is to ensure student achievement.  I strive to

create and maintain a safe and appropriate environment conducive to learning."  Rhee Mot.,

William L. Drake Declaration, Exh. 1 (June Email).[1]

The email continues, with Mpoy focusing his concerns on specific issues personal to his

work at the school:

> 1) I was suspended without pay and without due process; 2) my
> DCPS e-mails containing documentation and evidence of wrong
> doing were illegally deleted and compromised; 3) Dr. Presswood,
> the principal of Ludlow Taylor, misrepresented students'
> performance and results on the DCCAS Alternative; 4) the
> paraprofessionals and possibly Dr. Presswood induced students to

---

[1] Where, as here, an exhibit is incorporated by reference into the complaint, a court may consider it without converting the motion into one for summary judgment.  See Vila v. Inter-Am. Inv., Corp., 536 F. Supp. 2d 41, 46 n.5 (D.D.C. 2008) (citing Kurtis A. Kemper, What Matters not Contained in Pleadings may be Considered in Ruling on a Motion to Dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure or Motion for Judgment on the Pleadings under Rule 12(c) without Conversion to Motion for Summary Judgment, 138 A.L.R. Fed. 393 (1997)).

> lie and to disrupt the educational process; 5) the paraprofessionals
> engaged in a campaign to disrupt the educational process; 6) I
> apprised Dr. Presswood of the paraprofessionals' conduct with
> more than twenty emails; and he failed to respond to any of them
> or take action of any kind; 7) I asked Dr. Presswood to grant me
> permission to request consent from parents for me to install a video
> camera in my classroom; he never responded; 7) [*sic*] and I stated
> in one of my e-mails to Dr. Presswood that if the paraprofessionals
> continued to disrupt the educational process, I would write directly
> to Chancellor Rhee and request permission to install a video
> camera in my classroom.

Id.  Of the eight enumerated grounds for investigation, seven pertain to actions that exclusively

involve Mpoy's classroom.  Id.  Only his third claim alleging that the school's principal

"misrepresented students' performance and results on the DCCAS Alternative" can be

understood to raise broader claims about the functioning of the school.  Id.  Beyond this mention,

however, the lengthy email detailing the challenges Mpoy claims to have experienced contains

no discussion of this issue.  See id.

    Mpoy's email sets forth eight complete paragraphs detailing the events surrounding his

complaint, including:

- the school's failure to provide Mpoy with books for his students, see id., ¶ 1;

- concerns about the conduct and attire of Mr. Walker, a paraprofessional assigned to work in Mpoy's classroom, which ultimately resulted in his removal from the classroom, see id., ¶¶ 2-3;

- "unprofessional conduct" by the remaining paraprofessional (Mrs. Lacey) in Mpoy's classroom, id., ¶ 4;

- refusal by principal to provide Mpoy with feedback from his classroom performance observation, see id.;

- failure to distribute work Mpoy had left for students to complete when he took leave, see id., ¶ 5;

- verbal abuse by paraprofessionals (including referring to Mpoy as a "liar, backstabbing snitch"), id., ¶ 6;

- an ongoing "campaign to disrupt the educational process" by paraprofessionals, which included: showing non-educational movies during instructional time, taking additional recess during instructional time, playing non-educational games with students during instructional time, "inciting students to disrupt the educational process," "inducing students to lie," "allowing the cell phone to ring to rap music which students sing when the cell phone rings," *etc.*, id., ¶¶ 6-7; and

- Presswood's failure to respond to the conduct discussed above and general inaction in response to above claims.

See id., ¶ 8.  The email also includes a paragraph detailing Mpoy's pursuit of personal grievances with his direct supervisor – the school's principal – and his dissatisfaction with this process.  See id.

The "form and context" in which Mpoy's complaints were made "are indicative of the fact that they intended to address only matters connected with" his job at Ludlow.  See Boyce v. Andrew, 510 F.3d 1333, 1343 (11th Cir. 2007).  In Boyce, the Eleventh Circuit rejected a claim by caseworkers at a county Department of Family and Children Services that their complaints about working conditions were protected by the First Amendment:

> A "public employee may not transform a personal grievance into a matter of public concern by invoking a supposed popular interest in the way public institutions are run."  "[T]he relevant inquiry is not whether the public would be interested in the topic of the speech at issue but rather is 'whether the purpose of the [the plaintiff's] speech was to raise issues of public concern.'"  . . . The record in this case reveals that the speech of [plaintiffs], while ostensibly intermingled with issues of child safety and DeKalb DFCS mismanagement, was not intended to address matters of public concern from the perspective of a citizen.  See White Plains Towing Corp. v. Patterson, 991 F.2d 1049, 1059 (2d Cir. 1993) (recognizing that "[e]ven as to an issue that could arguably be viewed as a matter of public concern, if the employee has raised the issue solely in order to further his own employment interest, his First Amendment right to comment on that issue is entitled to little weight").

510 F.3d at 1344-45 (some internal citations omitted).

16

In <u>Weintraub</u>, moreover, the Second Circuit found that a teacher's grievance concerning the handling of a student who had thrown books at him in his classroom related to the teacher's ability to maintain the classroom discipline necessary for effective teaching and was thus "part-and-parcel of his concerns about his ability to properly execute his duties"; as a result, the complaint was uttered by the teacher as an employee, rather than as a private citizen.  593 F.3d at 202-04 (citations and internal quotation marks omitted).  Similarly, in <u>Dorcely v. Wyandanch Union Free School Dist.</u>, 665 F. Supp. 2d 178 (E.D.N.Y. 2009), the court held that "[t]he substance of Plaintiff's complaints concerning the lack of sufficient educational and instructional resources and the appropriateness of the counseling curriculum are matters relating to Dorcely's own job responsibilities as an educator and school psychologist, and therefore is unprotected speech."  <u>Id.</u> at 207; <u>see also</u> <u>Ankney v. Wakefield</u>, No. 10-1290, 2012 WL 2339683, at *6-7 (W.D. Pa. June 19, 2012) (finding teacher's duties encompassed reporting unsafe conditions at school in order to have them remedied, such that reporting of these issues was not entitled to private-citizen First Amendment protection); <u>Kelly</u>, 2012 WL 1077677, at *12-14 ("<u>internal</u> complaints by teachers about student/teacher issues based upon information learned through their jobs – whether it be safety issues, staffing/service issues, violation of school policy, or misuse of school property/information – constitute speech as a public employee, rather than a private citizen, and are not protected by the First Amendment" (emphasis in original) (collecting cases)); <u>Massaro v. Dep't of Educ. of the City of New York</u>, No. 08-10678, 2011 WL 2207556, at *3 (S.D.N.Y. June 3, 2011) ("Plaintiff's complaints regarding the sanitary conditions in her classroom and the health concerns that arose from them were made pursuant to her duties as an employee . . . .  Communications of concerns about such matters are, thus, part and parcel of a teacher's duties as a public employee . . . ."); <u>Medina v. Dep't of Educ. of City of New York</u>, No.

10-1180, 2011 WL 280800, at *3-4 (S.D.N.Y. Jan. 14, 2011) (guidance counselor's complaints about school's policy on suspension and inadequate supervision of students were within scope of his official duties for First Amendment purposes); Felton v. Katonah Lewisboro Sch. Dist., No. 08-9340, 2009 WL 2223853, at *5 (S.D.N.Y. July 27, 2009) (teachers' complaints regarding "school supplies for their kindergarten class, the physical state of the classroom in which they taught, the appropriateness of the curriculum, the inadequacy of their student profiles, and the safety implications . . . of those inadequate student profiles" were made pursuant to their duties as educators to ensure "that a classroom is well supplied, safe, and conducive to learning"); Shums v. New York City Dep't of Educ., No. 04-4589, 2009 WL 750126, at *14 (E.D.N.Y. March 17, 2009) (teacher's speech regarding adequacy of state-mandated instruction provided to students was not entitled to constitutional protection); Smith v. Beaufort Cnty. Sch. Dist., No. 06-185, 2008 WL 821809, at *9 (D.S.C. March 25, 2008) (teacher's complaints about her coworkers, working environment, and alleged mistreatment of students were made pursuant to her duties as a teacher and were not protected by the First Amendment); Renken v. Gregory, 541 F.3d 769, 774-75 (7th Cir. 2008) (professor's claim of retaliation for lodging complaints about dean over budget dispute was barred by Garcetti, as professor was speaking as an employee, rather than as a private citizen).

Despite this substantial body of caselaw, Mpoy nonetheless contends that he was speaking as a public citizen when he made disclosures regarding "waste, abuse, fraud, unethical conduct, and ineffective and/or illegal use of funds in the public education system" because he had "no administrative, managerial, operational, investigative, or compliance-related responsibilities" in his role as a special-education teacher.  Pl.'s Opp. at 18.  The Court finds this

understanding of his duties to be too formalistic, ignoring the realities of the responsibilities of public school teachers, as set forth in the authorities cited above.

Additionally, while not dispositive, the fact that Mpoy raised his complaints up the chain of command supports the Court's conclusion that the speech was undertaken pursuant to his job. See Fox v. Traverse City Area Public Schools Bd. of Educ., 605 F.3d 345, 349-50 (6th Cir. 2010) ("'Cases from other circuits are consistent in holding that when a public employee raises complaints or concerns up the chain of command at his workplace about his job duties, that speech is undertaken in the course of performing his job.'") (quoting Davis v. McKinney, 518 F.3d 304, 313 (5th Cir. 2008)).  Mpoy claims that he was not reporting up the chain of command when he contacted Rhee as "DCPS is a sophisticated modern bureaucracy with many layers of management, and it may be surmised that Defendant Rhee was not an immediate or intermediate supervisor of Mpoy or Presswood . . . .  Mpoy reported outside his chain of command to an official several levels above his supervisor."  Pl.'s Opp. at 18 n.4.  The Court, however, finds this distinction unhelpful.  As the Second Circuit held in Ross, where a plaintiff decides to "tak[e] a complaint up the chain of command to find someone who will take it seriously[, it] 'does not, without more, transform [her] speech into protected speech made as a private citizen.'" 693 F.3d at 307 (internal citations omitted).

As Chancellor, Rhee was responsible for the administration of the District's school system, and Mpoy's decision to raise internal complaints with her, as opposed to the media, further supports the conclusion that his speech was made pursuant to his duties as teacher.  See, e.g., Kelly, 2012 WL 1077677, at *12-14 (teacher's complaints regarding her supervisor's improper conduct were made as public employee where such complaints were pursuant to her general duties as a teacher, were directed at school administration (rather than news media or

third parties outside of school), and "resulted from special knowledge gained through plaintiff's employment").

Although the Court is not unsympathetic to what Plaintiff alleges occurred here – indeed, his allegations are quite troubling, particularly in the realm of falsification of test scores – it nonetheless cannot find that Plaintiff has alleged a violation of the First Amendment. His other claims – *e.g.*, for wrongful termination or as a whistleblower – may ultimately fare better, although the Court offers no opinion here on their merits.

D.     Qualified Immunity

Even if this Court were to find Plaintiff's speech to be protected, his § 1983 claim against Presswood and Rhee – the District having been dismissed earlier – would nonetheless be barred by qualified immunity. To determine whether an official is entitled to qualified immunity, the Court must consider whether the facts, viewed in the light most favorable to the plaintiff, establish a violation of a constitutional right and, if so, whether that right was clearly established at the time of the alleged violation. See Pearson v. Callahan, 555 U.S. 223, 231-43 (2009). The Court has the discretion to decide "which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." Id. at 236.

In this case, the Court's analysis begins and ends with the second prong of the qualified-immunity inquiry. For the reasons set forth in Sections III.B-C, *supra*, the Court finds that the contours of the right at issue in this case were not sufficiently clear such that Defendants Rhee and Presswood would have reasonably understood that their actions violated Mpoy's rights. "An official enjoys protection from a lawsuit where [his] conduct is objectively reasonable in light of existing law. Conversely, an officer is not shielded where he could be expected to know that certain conduct would violate statutory or constitutional rights." Brown v. Fogle, 819 F. Supp.

2d 23, 28-29 (D.D.C. 2011) (quoting Farmer v. Moritsugu, 163 F.3d 610, 613 (D.C. Cir. 1998)

(internal quotation marks omitted)).

Even if this Court had employed the pre-Garcetti standard and determined that Mpoy

was "speaking on a matter of public concern," as Plaintiff urged it to do, the Court cannot find

that this right was clearly established at the time of the violation.  Indeed, Plaintiff's Opposition

acknowledges the uncertainty of the public-employee-speech jurisprudence as it applies to

teachers in different settings.  See, e.g., Pl.'s Opp. at 12-13 (noting lack of guidance from

Supreme Court or D.C. Circuit on Garcetti's application to public school teachers); see also

Butera v. Dist. of Columbia, 235 F.3d 637, 654 (D.C. Cir. 2001) (constitutional right not clearly

established where there was "lack of clarity in the law of the circuits").  Plaintiff thus cannot

plausibly claim that Rhee or Presswood could have been expected to know that their conduct

violated Mpoy's rights.  Mpoy's § 1983 claim against Defendant Presswood and Rhee,

accordingly, would be barred by qualified immunity even if the Court found it was legally

sufficient.

     E.      Supplemental Jurisdiction

Having dismissed the sole federal claim, the Court must determine whether to retain

jurisdiction over the remaining state-law claims (Counts II, III, IV, V & VI).  Plaintiff argues that

the Court need not address the question of supplemental jurisdiction, as "even without [his

federal claim], the Court still has diversity jurisdiction over Mr. Mpoy's statutory and common

law claims."  See Pl.'s Opp. at 41.  Plaintiff's argument is flawed, however, because "the

District, like the fifty states, is not subject to diversity jurisdiction."  Long v. Dist. of Columbia,

820 F.2d 409, 414 (D.C. Cir. 1987).  The Court must, consequently, determine whether to

exercise supplemental jurisdiction here.

Federal district courts are given supplemental (or "pendent") jurisdiction over state claims that "form part of the same case or controversy" as federal claims over which they have original jurisdiction.  28 U.S.C. § 1367(a).  By the same token, they "may decline to exercise supplemental jurisdiction over [such] claim[s] . . . if . . . the district court has dismissed all claims over which it has original jurisdiction[.]"  § 1367(c)(3).  The decision of whether to exercise supplemental jurisdiction where a court has dismissed all federal claims is left to the court's discretion as "pendent jurisdiction is a doctrine of discretion, not of plaintiff's right."  United Mine Workers of America v. Gibbs, 383 U.S. 715, 726 (1966).  When deciding whether to exercise supplemental jurisdiction over state claims, federal courts should consider "judicial economy, convenience and fairness to litigants."  Id.  "[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine – judicial economy, convenience, fairness, and comity – will point toward declining to exercise jurisdiction over the remaining state-law claims."  Carnegie–Mellon Univ. v. Cohill, 484 U.S. 343, 350 n.7 (1988); see also Edmondson & Gallagher v. Alban Towers Tenants Ass'n, 48 F.3d 1260, 1267 (D.C. Cir. 1995) (finding the discretion set out in Carnegie–Mellon Univ. "unaffected by the subsequent enactment of 28 U.S.C. § 1367(d), in the Judicial Improvements Act of 1990").

Here the factors weigh against retention of the case.  All federal claims against Defendants have been dismissed.  The case has not progressed in federal court past motions for judgment on the pleadings, discovery has just commenced, and the Court has developed little familiarity with the issues presented.  Cf. Schuler v. PricewaterhouseCoopers, LLP, 595 F.3d 370, 378 (D.C. Cir. 2010) (finding district court appropriately retained pendent jurisdiction over state claims where it had "invested time and resources" in case).  The Court can thus conceive of

no undue inconvenience or unfairness to the litigants that would result from such a decision. Finally, Plaintiff will not be prejudiced because 28 U.S.C. § 1367(d) provides for a tolling of the statute of limitations during the period the case was here and for at least 30 days thereafter.  See Shekoyan, 409 F.3d at 419 (affirming district court finding that because of tolling, dismissal of pendent state claims "will not adversely impact plaintiff's ability to pursue his District of Columbia claims in the local court system") (internal citation omitted).  Therefore, to the extent the statute of limitations had not already run on Plaintiff's state-law claims at the time he filed this suit, this Court's decision to decline supplemental jurisdiction over such claims will not prejudice him.  The Court, therefore, will dismiss Mpoy's remaining claims without prejudice, and Plaintiff may bring such claims, if not barred, in the appropriate state or local court.

## IV.    Conclusion

For the foregoing reasons, the Court will issue a contemporaneous Order granting Defendant Rhee and Defendants District of Columbia and Presswood's Motions for Judgment on the Pleadings.

/s/ James E. Boasberg
JAMES E. BOASBERG
United States District Judge

Date:  November 5, 2012